**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

LLOYD C. PEEPLES, III,

     Plaintiff,

v.

CAROLINA CONTAINER, LLC,
NEW-INDY CONTAINERBOARD,
LLC, KRAFT GROUP, LLC, and
WILLIAM PONDER,

     Defendants.

Civil Action No. _____

## **COMPLAINT**

Comes now Lloyd C. Peeples, III, and files this Complaint against

Defendants Carolina Container, LLC, New-Indy Containerboard, LLC, Kraft

Group, LLC, and William Ponder, showing the Court as follows:

## **INTRODUCTION**

1.     This case is about a botched wire transfer—a transfer that was

intended for Plaintiff Peeples, but was instead sent to a bank account in Hong

Kong due to the negligent acts and omissions of the Defendants.  Peeples seeks to

recover all damages that the Defendants have caused him when they failed to act in

a reasonable manner in wiring a substantial sum of money, including punitive

damages as against Kraft Group, LLC.[1]

2.     Plaintiff Lloyd C. Peeples, III ("Peeples") was the sole shareholder and Chief Executive Officer of Container Service Corporation ("CSC"), a Georgia company that designed, manufactured, and sold cardboard packaging from its facility in Ringgold, Georgia.

3.     In January 2017, Peeples sold the assets of CSC (the "Transaction") for a substantial purchase price (the "Purchase Price").  Under the Asset Purchase Agreement for the Transaction, 5% of the Purchase Price was retained for a period of 18-months (the "Holdback Amount"), at which point some or all of the Holdback Amount would be paid.

4.     But Peeples never received the Holdback Amount because of the acts and omissions of the Defendants and their employees and agents, as further described below.  Instead, the Holdback Amount was improperly wired to an account in Hong Kong established by cybercriminals.  The Hong Kong account was liquidated before the fraud scheme and theft were discovered.

---

[1] The amounts of the Purchase Price and the Holdback Amount are not included in the Complaint for a number of reasons, including, but not limited to, respecting the confidentiality provision contained in the Asset Purchase Agreement.  Plaintiff's counsel intends to propose a protective order to the Defendants, such that unredacted documents, which contain the Purchase Price and the Holdback Amount, can be submitted to the Court under seal.  Both the Purchase Price and the Holdback Amount are substantial sums of money.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff Lloyd C. Peeples, III is a resident of Birmingham, Alabama. At all times relevant to this Complaint, he was the sole shareholder of CSC, a Georgia company that owned and operated a manufacturing facility in Ringgold, Georgia for cardboard packaging.

6.     Defendant Carolina Container, LLC ("Carolina Container") is a Delaware limited liability company with its principal place of business in High Point, North Carolina.  On information and belief, Carolina Container's sole member is New-Indy Containerboard, LLC, which is a citizen of Delaware and California for jurisdictional purposes.

7.     Carolina Container is the successor-in-interest to Carolina Container Corporation, a North Carolina corporation that entered into the Asset Purchase Agreement with CSC and Peeples.  Based on information and belief, Carolina Container Corporation was converted to Carolina Container, LLC on February 17, 2017, approximately one month after the Asset Purchase Agreement closed.

8.     Defendant New-Indy Containerboard, LLC ("New Indy") is a Delaware limited liability company with its principal place of business in Ontario, California.  On information and belief, New Indy has two members:  Kraft Group, LLC and the Schwartz Partners, LP.  (*See* The Kraft Group Website (available at

3

www.thekraftgroup.com/new-indy-containerboard).)  Kraft Group, LLC is a

citizen of Delaware and Massachusetts for jurisdictional purposes.  Schwartz

Partners, LP is a citizen of Indiana for jurisdictional purposes.

9.      New Indy and/or Kraft acquired Carolina Container in 2015.  (*See id*.)

In 2017, New Indy and/or Kraft, by and through Carolina Container, acquired the

assets of CSC under the Asset Purchase Agreement at issue in this litigation.  (*See*

*id*.)[2]

10.     Defendant Kraft Group, LLC ("Kraft") is a Delaware limited liability

company with its principal place of business in Foxborough, Massachusetts.

11.     Carolina Container, New Indy, and Kraft are, at times, collectively

referred to as the "Kraft Defendants."

12.     Defendant Bill Ponder ("Ponder") is a resident of Dalton, Georgia and

may be served at 402 W. Cuyler Street, Dalton, Georgia 30720.

13.     Carolina Container, New Indy, Kraft, and Ponder are, at times,

collectively referred to as the "Defendants."

14.     This Court has subject-matter jurisdiction over this case because

complete diversity exists between Peeples, on the one hand, and the Kraft

---

[2] Kraft's website asserts that New Indy acquired CSC in 2016.  (*Id*.)  Technically,
the Asset Purchase Agreement is dated December 15, 2016 and the Transaction
closed on January 3, 2017.

Defendants, members of the Kraft Defendants, and Ponder, on the other hand, and because the amount in controversy exceeds $75,000.00.  *See* 28 U.S.C. § 1332(a).

15.    The Kraft Defendants are subject to the jurisdiction of this Court because the Long-Arm Statute (O.C.G.A. § 9-10-91) is satisfied and because the Kraft Defendants have sufficient minimum contacts with the State of Georgia under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution as it relates to the Transaction and the payment of the Holdback Amount.

16.    The Long-Arm Statute is satisfied as to Carolina Container because:

a.    Carolina Container transacted business in this State by entering the Asset Purchase Agreement to purchase CSC's assets, including its Ringgold, Georgia facility;

b.    Carolina Container continues to transact business in this State by operating the Ringgold, Georgia facility, selling corrugated packaging in this State, and registering to do business in this State; and

c.    Carolina Container owns, uses, and/or possesses real property in this State.

17.    The Long-Arm Statute is satisfied as to Kraft because:

a.      Kraft purposefully transacted business in this State by approving the purchase of a Ringgold, Georgia facility for the substantial Purchase Price;

b.      Kraft purposefully transacted business in this State by funding all or part of the Purchase Price and/or the Holdback Amount;

c.      Kraft purposefully transacted business in Georgia by and through the conduct of its employees and agents, who led, negotiated, drafted, and completed the Transaction;

d.      Kraft purposefully transacted business in Georgia by and through the conduct of its employees and agents, who negotiated the amount of the Holdback Amount and instructed that the Holdback Amount be wired to Hong Kong;

e.      Kraft continues to purposefully transact business in this State through its control and management of Carolina Container and because, on information and belief, Carolina Container passes on substantial profits to Kraft;

f.      Peeples' cause of action against Kraft arises from or is connected to the actions and omissions of Kraft employees and agents concerning the Transaction and the payment of the

Holdback Amount; and

g.     The exercise of jurisdiction over Kraft would not offend

traditional fairness or substantial justice.

18.    The Long-Arm Statute is satisfied as to New Indy because:

a.     New Indy purposefully transacted business in this State by

funding all or part of the Purchase Price;

b.     New Indy purposefully transacted business in Georgia by and

through the conduct of its employee(s), who wired the

Holdback Amount to Hong Kong;

c.     New Indy continues to purposefully transact business in this

State through its control and management of Carolina Container

and because, on information and belief, Carolina Container

passes on substantial revenue to New Indy;

d.     Peeples' cause of action against New Indy arises from or is

connected New Indy's actions concerning the Holdback

Amount; and

e.     The exercise of jurisdiction over New Indy would not offend

traditional fairness or substantial justice.

19.    The Kraft Defendants also have sufficient minimum contacts with this

State under Due Process considerations to reasonably anticipate being subject to suit here, including, but not limited to, the following.

    a.    Carolina Container "deliberately affiliated" itself with the State when it entered the Asset Purchase Agreement with CSC and Peeples.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985).

    b.    Carolina Container "irrevocably and unconditionally" consented to the exclusive jurisdiction and venue of this Court in the Asset Purchase Agreement between it and CSC and Peeples. (*See* Asset Purchase Agmt. at Section 10.10(b).)

    c.    Carolina Container continues to purposefully avail itself of the laws of the State of Georgia by registering to do business in the State and by operating the Ringgold, Georgia facility.

    d.    New Indy and Kraft purposefully availed themselves of the laws of the State of Georgia by purchasing or causing the purchase of the Ringgold, Georgia facility.

    e.    New Indy and Kraft continue to avail themselves of the laws of the State of Georgia by deriving substantial revenue from the operation of the Ringgold, Georgia facility.

f.   New Indy and Kraft, by and through their respective employees and/or agents, committed tortious acts or omissions in connection with the Transaction and the payment of the Holdback Amount, which Plaintiff seeks to recover through this Lawsuit.

g.   Kraft, by and through its employees and agents, engaged in specific and ongoing Georgia-targeted conduct related to the Transaction and the payment of the Holdback Amount, including, but not limited to, its extensive communications and negotiations with Ponder, who at all times was in Dalton, Georgia, and the subject of which was the acquisition of a Georgia manufacturing facility.

h.   Kraft treats New Indy and Carolina Container as divisions or departments of Kraft, such that Kraft controlled New Indy and/or Carolina Container with respect to the Transaction (i.e., the acquisition of CSC) by, among other things, providing the purchasing capital and instructing its employees to lead, advise on, and complete the Transaction and the payment of the Holdback Amount.

       i.     Subjecting Kraft and New Indy to the jurisdiction of this Court would not offend notions of traditional fairness and substantial justice because it purposefully directed or allowed its employees to negotiate and close the Transaction for a manufacturing facility in Georgia. The negligence of Kraft and New Indy employees caused Peeples substantial harm, which he seeks to recover in this lawsuit.

20.     Ponder, as a Georgia citizen, is subject to the personal jurisdiction of this Court.

21.     Venue is proper in this Court because one Defendant, Ponder, resides in the Rome Division and because one or more of the Kraft Defendants own and operate a manufacturing facility in the Rome Division. *See* 28 U.S.C. § 1391. Venue is also proper here because Carolina Container "irrevocably and unconditionally" agreed so in the Asset Purchase Agreement. (*See* Asset Purchase Agmt. at Section 10.10(b).)

## **THE FACTS**

22.     CSC was in the business of manufacturing, transporting, and selling cardboard packaging products out of its facility in Ringgold, Georgia.

23.     In 2016, Carolina Container approached CSC about potentially

acquiring CSC's assets, including its Ringgold, Georgia facility.

24.     Specifically, in late summer 2016, Carolina Container's President, Ron Sessions, visited the Ringgold, Georgia facility and met with Peeples to discuss what a potential deal would look like.

25.     Over the next few months, the Kraft Defendants began their due diligence of a potential deal and CSC provided the Kraft Defendants with various information concerning CSC's business and its assets.

26.     In September or October 2016, a group from the Kraft Defendants visited Ringgold, Georgia for a few days to physically inspect the facility and review certain books and records of CSC.

27.     After the Kraft Defendants completed their due diligence, the parties began to draft, discuss, and negotiate an asset purchase agreement (the "Asset Purchase Agreement") to outline the terms of the Transaction.

28.     CSC and Peeples, as the sole shareholder of CSC, engaged Bill Ponder, a Dalton, Georgia attorney, to represent them in connection with the Transaction.

29.     Kraft employees, Jim Cobery and Andrew Lehrer, represented the Kraft Defendants in the Transaction. Under the Asset Purchase Agreement, Carolina Container was the purchasing entity.

30.     Cobery and Lehrer engaged in significant discussions, correspondence, and negotiations with Ponder, who at all times was in Dalton, Georgia, concerning the Transaction between late 2016 and early 2017, including but not limited to, the drafting and the negotiating of a 60-plus page Asset Purchase Agreement and its seven exhibits.

31.     Ultimately, the parties agreed to the terms of the Asset Purchase Agreement dated December 15, 2016.

32.     Under the Asset Purchase Agreement, the parties agreed that Carolina Container was allowed to hold back 5% of the Purchase Price to take into account any adjustments in the working capital account between closing and 18 months thereafter, i.e., the Holdback Amount.

33.     On or about January 3, 2017, the Transaction closed and the Purchase Price, less expenses, debts, and the Holdback Amount, was wired to an account controlled by CSC.

34.     On information and belief, each of the Kraft Defendants contributed to the Purchase Price.

35.     Under the Asset Purchase Agreement, Carolina Container was required to pay the Holdback Amount, less any appropriate reductions, to CSC and/or Peeples by July 3, 2018 (i.e., 18 months after the closing of the

Transaction).

36.    CSC assigned its interest in the Holdback Amount to Peeples, and CSC was dissolved as a corporation.

37.    In June 2018, Ponder, on Peeples' behalf, began discussing and negotiating the payment of the Holdback Amount with Jim Cobery and Andrew Lehrer, employees of Kraft.

38.    Specifically, on June 25, 2018, Cobery received wiring instructions from Ponder via email related to the payment of the Holdback Amount.

39.    The wiring instructions were for an account with Bank of New York Mellon (the "BNY Mellon Account").

40.    The wiring instructions for the BNY Mellon Account indicated that it was owned and controlled by Peeples.

41.    Ponder requested that the Holdback Amount be wired to the BNY Mellon Account.

42.    Ponder's June 25, 2018 email was not encrypted.

43.    Cobery did not call Ponder to confirm and verify that the wiring instructions for the BNY Mellon Account were correct.

44.    On June 30, 2018, Andrew Lehrer, a Kraft employee, responded to Bill Ponder's email, and asked him "to confirm that your expectation for the

13

escrow payment is [omitted] (5% of the Purchase Price Cash Amount)."

45.    On July 2, 2018, Ponder responded to Lehrer (with a copy to Cobery) and disputed the amount because of certain credits and offsets not accounted for, contending that the correct Holdback Amount was approximately $25,000 more than exactly 5% of the Purchase Price.

46.    On July 3, 2018, unbeknownst to Ponder, a person posing as Ponder sent an email to Lehrer, which stated:

> Andrew,
>
> Yes [sic] just confirmed and you got the correct amount, [sic] Sorry for the confusion.  I hope you get the new wiring instruction, [sic] they want the funds wire [sic] into the investment account (JAE Holdings).  I have attached the bank details again to [sic] wire the amount of [omitted].
> Please send payment confirmation once its [sic] done Asap so i [sic] can forward to them.
>
> Thanks [sic]
>
> Bill

47.    The wiring instructions attached to the July 3, 2018 email were for an account with CTBC Bank Co., Ltd. in Hong Kong and for an entity called JAE Holding Limited (the "Hong Kong Account").

48.    Neither Lehrer nor Cobery questioned the sudden change in positions from Ponder (accepting the reduced Holdback Amount) via email or otherwise; nor

14

did they question the grammatical and spelling errors replete throughout the July 3, 2018 email; nor did they question the change from the BNY Mellon Account to the Hong Kong Account.

49.     And nor did Lehrer or Cobery call Ponder on the telephone to confirm that the new wiring instructions—*to Hong Kong*—were correct.

50.     Instead, shortly after receiving the fake July 3 email, Lehrer immediately forwarded the fraudulent wiring instructions to Scott Conant, a New Indy employee, and Todd Hammond, a Carolina Container employee, and instructed them to complete the substantial wire to the Hong Kong Account.

51.     Neither Scott Conant nor Todd Hammond questioned Lehrer's instructions, the fact that the wire was being sent to Hong Kong, or called Ponder to confirm.

52.     On information and belief, Scott Conant caused the wire to the Hong Kong Account to be completed on July 3, 2018.

53.     Following the July 3, 2018 wire and for at least one week thereafter, no one on behalf of any of the Kraft Defendants called or contacted Ponder or Peeples to confirm that the substantial Holdback Amount was received.

54.     On July 9, 2018, Ponder received an email from a person posing as Lehrer, who stated "Hi Bill – Yes you got it right, [sic] I will let you know once

15

the wire is made this week.  Sorry for the confusion."  This email was in response to Ponder's July 2, 2018 email, which noted that the wire should be in the higher amount.

55.     Lehrer's July 9, 2018 email was sent from a "spoofed" email address of Lehrer, where the domain name was changed from @thekraftgroup.com to @thakraftgroup.com.

56.     On July 13, 2018, a second spoofed email was sent to Ponder from AndrewL@thakraftgroup.com, which stated:

> Bill – Our business team advised the wire in the amount of [the higher amount requested by Ponder] will be made by the end of the month, [sic] We are trying to [sic] things sorted asap.  I will follow up as soon as I have an update when it's done.  Sorry for any inconveniences and delay.

57.     These spoofed emails were intended to prevent Ponder and Peeples from further inquiring and encouraging them to believe that the wire had not already been executed.

58.     Based on information and belief, funds wired to Hong Kong banks are subject to a holding period.

59.     By falsely communicating with both sides of the transaction, the cybercriminals were able to avoid detection until after the holding period expired.

60.     The Kraft Defendants have attempted to recover the monies through the banking channels, but those attempts have not been successful.

16

61.     Peeples has demanded that the Kraft Defendants pay him the required

Holdback Amount.  They have refused.

62.     Peeples has also demand that Ponder reimburse Peeples for the lost

Holdback Amount.  Ponder has not made any reimbursement payment.

## THE PREVALENCE OF BUSINESS EMAIL COMPROMISE SCAMS

63.     The scheme executed to divert the Holdback Amount to the Hong

Kong Account is not new or unknown.

64.     Rather, the FBI has been releasing public service announcements to

the general public since at least January 22, 2015, warning businesses of email

scams nearly identical to what occurred here, often referred to as Business Email

Compromise ("BEC") or Email Account Compromise ("EAC") scams.  (Jan. 22,

2015 FBI PSA, Alert No. I-012215-PSA, "Business E-Mail Compromise"

(attached as Exhibit 1).)

65.     According to the FBI's most recent public service announcement on

BEC/EAC scams, the scheme has grown from $179 million in losses as of January

2015 to over $12 billion in total losses as of May 2018.  (July 12, 2018 FBI PSA,

Alert No. I-071218-PSA, "Business E-mail Compromise:  The 12 Billion Dollar

Scam" (attached as Exhibit 2).)

66.     The FBI defines BEC as a scam targeting businesses working with

foreign suppliers and/or businesses that regularly perform wire transfer payments. (*Id*.)

67.     An EAC scam is similar; it involves similar methods and techniques as BEC scams, except that an EAC scam targets individuals rather than businesses. (Aug. 27, 2015 FBI PSA, Alert No. I-082715b-PSA, "E-mail Account Compromise" (attached as Exhibit 3).)

68.     Since its first warning in January 2015, the FBI has advised that "Asian banks, located in China and Hong Kong, are the most commonly reported ending destination for these fraudulent transfers."  (Jan. 22, 2015 FBI PSA.)

69.     Eight months after the FBI released its first BEC public service announcement, it released an updated alert on August 27, 2015.  (Aug. 27, 2015 FBI PSA, Alert No. I-082715a-PSA, "Business Email Compromise" (attached as Exhibit 4).)

70.     In the August 27, 2015 updated alert, the FBI reported that there had been a 270% increase in identified victims and exposed losses in the approximately eight months since the January 2015 public service announcement.  (*Id*.)

71.     It also reported that total U.S. exposed dollar losses increased from $179 million to $747 million in the eight-month span from January 2015 to August 2015.  (*Id*.)

72.     The FBI also advised that all businesses should confirm and verify wire transfer requests and information through a two-factor authentication process and to "carefully scrutinize all e-mail requests for transfer of funds …."  (*Id*. at 3.)

73.     On the same day, August 27, 2015, the FBI also released a public service announcement about EAC scams.  (Aug. 27, 2015 FBI PSA.)  One of the examples of an EAC scam includes compromising an attorney's email account, which is then used to send updated wire instructions to the sender of the wire.  (*Id*.)

74.     On June 14, 2016, the FBI released a fourth public service announcement concerning email scams.  (June 14, 2016 FBI PSA, Alert No. I-061416, "Business E-mail Compromise: The 3.1 Billion Dollar Scam" (attached as Exhibit 5).)  It reported that "[s]ince 2015, there has been a 1,300% increase in identified exposed losses."  (*Id*. at 2.)  The FBI also reiterated the need for two-factor authentication when confirming and verifying wire instructions.  (*Id*. at 5 ("Establish other communication channels, such as telephone calls, to verify significant transactions.  Arrange this second-factor authentication early in the relationship outside the e-mail environment to avoid interception by a hacker.").)

75.     The FBI released a fifth public service announcement on May 4, 2017, announcing that BEC and EAC scams now top $5 billion in total losses. (May 4, 2017 FBI PSA, Alert No. I-050417-PSA, "Business E-mail Compromise –

Email Account Compromise:  The 5 Billion Dollar Scam" (attached as Exhibit 6).)
Again, two-factor authentication was included as part of the FBI's guidance for
protecting against BEC and EAC scams.  (*Id*. at 5.)

76.    The FBI released a sixth and seventh public service announcement on
email scams on June 11, 2018 and July 12, 2018, respectively.  (June 11, 2018 FBI
PSA, Alert No. I-061118-PSA, "Business Email Compromise Contributes to Large
Scale Business Losses Nationwide" (attached as Exhibit 7); July 12, 2018 FBI
PSA.)  The FBI updated previous alerts and determined that the total dollar loss
associated with BEC scams from October 2013 through May 2018 now topped $12
billion.  (July 12, 2018 FBI PSA.)

77.    In its July 12, 2018 PSA, the FBI also noted that "Asian banks located
in China and Hong Kong remain the primary destinations of fraudulent funds."
(*Id*.)  The warning as to banks in China and Hong Kong have remained consistent
throughout the FBI's public service announcements.  (*See*, *e.g.*, Jan. 17, 2015 FBI
PSA; June 14, 2016 FBI PSA ("Reports indicate that fraudulent transfers have
been sent to 79 countries with the majority going to Asian banks located within
China and Hong Kong.").)

## COUNT I
## NEGLIGENCE/RESPONDEAT SUPERIOR
(Against the Kraft Defendants)

78.     Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77.

79.     The Asset Purchase Agreement required Carolina Container to pay Peeples the Holdback Amount.

80.     Carolina Container relied on its employee (Todd Hammond) and the employees of New Indy (Scott Conant) and Kraft (Jim Cobery and Andrew Lehrer) to carry out its obligations to pay Peeples the Holdback Amount.

81.     Employees of the Kraft Defendants agreed to wire the Holdback Amount to Peeples.  Persons that agree to wire monies, particularly large amounts, owe a duty of care to the intended recipient of the monies.

82.     Among other things, that duty of care requires a person sending a wire to confirm and verify that he has the proper wiring instructions before initiating a wire.

83.     One way to do so, as repeatedly recommended by the FBI, is to employ a two-factor authentication process, which means that if wiring instructions are received via email, which occurred here, a phone call should be made to the sender of the email to confirm that the emailed wiring instructions are, in fact,

correct.  (*See* M. Lanterman Aff. ¶¶ 23 – 25 (attached as Exhibit 8).)

84.     As the FBI has repeatedly suggested, when calling to confirm, "previously known numbers, not the numbers provided in the e-mail request," should be used.  (Aug. 27, 2015 FBI PSA.)

85.     The Kraft Defendants are responsible for the negligent acts or omissions of their employees when such acts or omissions are committed within the scope of employment.

86.     Kraft employs Lehrer and Cobery as attorneys responsible for, among other things, drafting, negotiating, and closing legal transactions, including the proper execution of wire transfers.

87.     On information and belief, Lehrer and Cobery are legal professionals who regularly perform and/or supervise large financial transactions that are conducted electronically, and thus were, or should have been, aware of the danger of cybercrime and imposture, including the significant threat of BEC/EAC scams.

88.     Moreover, the Kraft Defendants are large, sophisticated entities who are or should be aware of BEC/EAC scams and the FBI's guidance on how to protect against BEC/EAC scams, and who have, or should have, appropriate policies and training programs in place to protect against BEC/EAC scams.  (*See*, *e.g.*, Jan. 22, 2015 FBI PSA; Aug. 27, 2015 FBI PSA; May 4, 2017 PSA; M.

Lanterman Aff. ¶¶ 16 – 33, 37 – 40; *see also* "Beware of the Surge in Wire Transfer Fraud via Spoofed Emails, by Alastair Sharp, May 5, 2017, Reuters (available at https://www.reuters.com/article/us-cyber-fraud-email/fbi-warns-of-surge-in-wire-transfer-fraud-via-spoofed-emails-idUSKBN1811QH) (last visited on January 17, 2019).)

89.     Based on that awareness and training, and Cobery and Lehrer's knowledge of wiring standards, processes, and procedures, they knew, or should have known, that wiring instructions that are sent via email must also be confirmed by a second form of communication, such as by telephone.

90.     Similarly, New Indy employs Scott Conant and Carolina Container employs Todd Hammond, who are, at times, responsible for initiating and sending wires on behalf of New Indy, Carolina Container, and/or Kraft.

91.     Here, Jim Cobery (Kraft) received wiring instructions on June 25, 2018 for the BNY Mellon Account.

92.     Eight days later, on July 3, 2018, Cobery and Lehrer (Kraft) received different wiring instructions, which would have the Holdback Amount sent to an account in Hong Kong.

93.     Neither Lehrer nor Cobery called Bill Ponder to confirm and verify that the Hong Kong Account was correct; instead, Lehrer immediately forwarded

23

the new—and wrong—wiring instructions to Scott Conant and Todd Hammond, who caused the wire to be completed.

94.     The July 3, 2018 email included a series of red flags indicating that it was sent by an imposter and was part of a BEC and/or EAC scam:

      a.     Ponder had disputed the Holdback Amount the previous day;

      b.     the name of the attachment misspelled Peeples' name;

      c.     the wiring instructions themselves did not mention Peeples' name (in contrast to the correct wiring instructions);

      d.     the significant shift in financial institutions—from a well-known American bank to a Hong Kong bank;

      e.     Hong Kong, where the new bank was located, is notorious for banking fraud schemes; and

      f.     the email contained a litany of grammatical and spelling errors, including the use of commas where periods should be used—an error not previously found in Ponder's email communications.

95.     Here, employees of the Kraft Defendants owed a duty to Peeples to follow basic wire protocol, and telephone Ponder after receiving changed wiring instructions, which diverted a substantial wire from the BNY Mellon Account to the Hong Kong Account.  (*See* M. Lanterman Aff. ¶¶ 23 – 25, 34 – 39.)

96.    Not following the two-factor authentication process has a foreseeable result: monies are sent to the wrong account.

97.    Had employees of the Kraft Defendants confirmed the wiring instructions by telephone, both on June 25, 2018, when the correct wiring instructions were sent, and on July 3, 2018, when the fraudulent wiring instructions were sent, the fraud would have been detected and Peeples would not have been injured.

98.    Employees of the Kraft Defendants breached their duty of care in a second way, too.

99.    They had an obligation to confirm that the wire was in fact received by the recipient, which must be done by telephone to ensure that hackers are not involved.  (*See* M. Lanterman Aff. ¶ 40.)

100.   None of the employees of the Kraft Defendants called Ponder after the wire was sent on July 3, 2018 to confirm receipt of the Holdback Amount.

101.   Peeples was injured as a result of the Kraft Defendants' negligence— both before and after the wire was executed.

102.   Peeples' injuries were proximately caused by the Kraft Defendants' breach of their duty of care to Peeples.

103.   The Kraft Defendants are liable in an amount to be determined by a

jury, but not less than the Holdback Amount, plus interest and attorneys' fees.

## COUNT II
## BREACH OF CONTRACT
(Against Carolina Container)

104.   Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77.

105.   The Asset Purchase Agreement between CSC, Peeples, and Carolina Container is a valid and binding contract.

106.   Under the Asset Purchase Agreement, Carolina Container held back 5% of the Purchase Price.

107.   Section 2.10 required Carolina Container to pay Peeples the Holdback Amount as near as possible to the 18-month anniversary of the closing of the Asset Purchase Agreement.

108.   Carolina Container attempted—but failed—to pay the Holdback Amount to Peeples as required by the Asset Purchase Agreement.

109.   Carolina Container is liable to Peeples for all consequential damages caused by its breach of the Asset Purchase Agreement.

## COUNT III
## NEGLIGENCE
(Against Kraft)

110.   Peeples incorporates and reiterates the factual allegations contained in

26

paragraphs 22 – 77 and 79 – 100.

111.   On information and belief, Kraft regularly engages in transactions that require the wiring of substantial sums of money, and thus Kraft regularly has access to and transmits sensitive information.

112.   Kraft has a duty to take reasonable measures to protect and secure its emails, email accounts, and servers so as to prevent cybercriminals from monitoring the transmission of sensitive information, such as when a substantial wire may occur.

113.   On information and belief, Kraft breached its duty to protect and secure its emails, email accounts, and servers, which allowed cybercriminals to monitor Kraft emails and become aware of the upcoming wire of the Holdback Amount.

114.   Kraft's breach proximately caused some or all of Peeples' damages.

115.   Kraft is liable to Peeples in an amount to be determined by a jury.

<u>**COUNT IV**</u>
**NEGLIGENCE**
(Against Ponder)

116.   Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77.

117.   Ponder owed Peeples a duty of care to secure and protect all email

communications sent on Peeples' behalf.

118.   As the FBI has advised on numerous occasions, to avoid becoming a victim of BEC scams, people should avoid free web-based email, and instead establish a website domain and use it to establish company email accounts.  (*See*, *e.g*., Jan. 22, 2015 PSA.)

119.   Ponder breached his duty to Peeples by:

a.   Using a free, web-based email account;

b.   Failing to adequately secure his email account and/or server;

c.   Failing to send encrypted emails, when emailing highly sensitive information; and

d.   Failing to timely notice the spoofed email sent on July 9, 2018.

120.   Ponder's breach proximately caused some or all of Peeples' damages.

121.   Ponder is liable to Peeples in an amount to be determined by a jury.

## COUNT V
## LEGAL MALPRACTICE
(Against Ponder)

122.   Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77, and 117 – 119d.

123.   Ponder is an attorney licensed to practice law in the State of Georgia.

124.   Ponder represented CSC and Peeples in connection with the drafting,

negotiating, and closing of the Asset Purchase Agreement, including the wiring of the Holdback Amount.

125.   As Peeples' attorney, Ponder owed Peeples a duty to exercise the degree of skill and care ordinarily employed by attorneys under similar conditions and like surrounding circumstances (the "minimum requisite standard of care").  In connection with his representation of Peeples, the minimum requisite standard of care included the responsibility to protect and keep secure all communications related to the Transaction.  (*See* P. Longan Aff. ¶¶ 17 – 27 (attached as Exhibit 9).)

126.   Since all or most of the communications related to the Transaction were electronic, Ponder had a duty to use reasonable methods and procedures secure his email account and computer system against intrusion by cybercriminals and thereby safeguard his communications on behalf of Peeples.  (*Id*.)

127.   As a legal professional who regularly performs or supervises large financial transactions that are conducted electronically, Ponder should have been aware of the danger of cybercriminals and imposture.  (*Id*.)

128.   To satisfy the minimum requisite standard of care to Peeples, Ponder had a duty to:

> a.   Use reasonable measures to secure Ponder's client files, and communications on behalf of his clients, including Peeples;

b.  Use reasonable measures to secure Ponder's email account and computer, including the data contained within them, from unauthorized third parties;

c.  Use reasonable measures to prevent Ponder's email account from being used or monitored by unauthorized third parties;

d.  Require a strict policy of orally confirming instructions for the electronic transfer of funds belonging to clients, which should include advance notification that funds should not be transferred unless any emailed instructions are orally confirmed;

e.  Require oral confirmation, following the electronic transfer of funds, to establish that the funds were actually received by the intended party; and

f.  Undertake the immediate investigation of any incident involving crime or cybercrime, to determine its cause, its perpetrator, and the possibility of remedying or mitigating any loss.

(*Id.*)

129.  Ponder failed to take these precautionary measures, which, in whole

or in part, violated the minimum requisite standard of care in his representation of Mr. Peeples.  Ponder's negligence resulted in criminals becoming aware of the large wire, criminals posing as Ponder, and criminals sending the Hong Kong wiring instructions to Lehrer and Cobery, Kraft employees.  (*Id*.)

130.   Had Ponder taken reasonable and necessary steps to secure his email system and computer files from unauthorized intrusion and/or monitoring, cybercriminals would not have been able to steal Peeples' money.

131.   Had Ponder requested the Kraft Defendants to orally confirm sending the wire, the stolen funds would have been recovered.

132.   Ponder's failure to satisfy his professional duty to secure communications on behalf of his client, Peeples, proximately caused all or part of Peeples' damages.

133.   Ponder is liable to Peeples in an amount to be determined by a jury.

<u>COUNT VI</u>
**ATTORNEYS' FEES & EXPENSES OF LITIGATION**
(Against the Kraft Defendants)

134.   Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77.

135.   O.C.G.A. § 13-6-11 entitles a litigant to his attorneys' fees when his adversary engages in bad faith or is stubbornly litigious.

136.   Here, the Kraft Defendants have acted in bad faith and been stubborn litigious in their conscious refusal to recognize the duty owed to Peeples.

137.   Peeples is, therefore, entitled to the reasonable attorneys' fees and expenses of litigation that he has incurred in bringing this action against the Kraft Defendants.

**COUNT VII**
**PUNITIVE DAMAGES**
(Against Kraft)

138.   Peeples incorporates and reiterates the factual allegations contained in paragraphs 22 – 77.

139.   Punitive damages are also appropriate as to Kraft because of its willful and wanton misconduct in the attempted payment of the Holdback Amount, which shows an entire want of care raising a presumption of conscious indifference as to the consequences.

140.   Kraft is a four-billion-per year company that is, or should be, well-versed in BEC and EAC scams and the dangers that each pose to wire transfers. (*See* M. Lanterman Aff. ¶¶ 16 – 33, 39.)

141.   Kraft has, or should have, policies and procedures in place advising employees on how to appropriately complete wire transactions, which implement a two-factor authentication process to verify and confirm wire instructions.  (*See id.*

¶¶ 20 – 33, 39.)

142.   Kraft trains, or should train, its employees on wire transfer protocol.

143.   Kraft employees Cobery and Lehrer ignored such wire transfer policies and protocol when they instructed the Holdback Amount to be wired to the Hong Kong Account without confirming with Ponder via a second form of communication that the new wire instructions were correct.

144.   Cobery and Lehrer also ignored obvious red flags in the July 3, 2018 email showing that the email was a BEC and/or a EAC scam, including but not limited to:

a.      Ponder disputed the Holdback Amount the previous day;

b.      the name of the attachment misspelled Peeples' name;

c.      the wiring instructions themselves did not mention Peeples' name (in contrast to the correct wiring instructions);

d.      the significant shift in financial institutions—from a well-known American bank to a Hong Kong bank;

e.      Hong Kong, where the new bank was located, is notorious for banking fraud schemes; and

f.      the email contained a litany of grammatical and spelling errors, including the use of commas where periods should be used—an

error not previously found in Ponder's email communications.

145.   Peeples is entitled to punitive damages to penalize, punish, and/or deter Kraft from behaving in such a way going forward, and unnecessarily harming others in the way that it has harmed Peeples.

## **DEMAND AND PRAYER**

WHEREFORE, Peeples prays for the following relief:

a.   That he be awarded the full Holdback Amount, plus pre- and post-judgment interest, attorneys' fees, and all other available damages caused by the acts and omissions of the Defendants, including punitive damages as against Kraft;

b.   That he have a jury trial on all issues so triable;

c.   That he be awarded all other relief, as may be just and necessary.

This 1st day of February, 2019.

**BRINSON, ASKEW, BERRY, SEIGLER, RICHARDSON & DAVIS, LLP**

/s/ Robert L. Berry
ROBERT L. BERRY
Georgia Bar No. 055650

/s/ I. Stewart Duggan
I. STEWART DUGGAN
Georgia Bar No. 232207

615 West First Street
P.O. Box 5007
Rome, Georgia 30162-5007

Phone:  706-291-8853

Fax:  706-234-3574

bberry@brinson-askew.com

isduggan@brinson-askew.com

lcarter@brinson-askew.com

/s/ Lee B. Carter

LEE B. CARTER

Georgia Bar No. 595903

*Counsel to Plaintiff Lloyd C. Peeples, III*