# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

Lloyd C. Peeples, III,

                Plaintiff,

                          Case No. 4:19-cv-21-MLB

v.

Carolina Container, LLC, and
William Ponder,

                Defendants.

_____/

## <u>OPINION & ORDER</u>

This case arises from a botched wire transfer. Defendant Carolina Container, LLC was supposed to wire $1.71 million to Plaintiff Lloyd C. Peeples, III under an asset purchase agreement. But it ended up wiring that money to a crook who hacked into the email account of Plaintiff's attorney (Defendant William Ponder) and used that account to send fraudulent payment instructions to Defendant Carolina. When the crook vanished with the money, Plaintiff sued Defendants to recover. Each party now moves for summary judgment. (Dkts. 149; 150; 152.) The Court grants Plaintiff's motion in part and denies Defendants' motions.

## I.    Background

In 2016, Defendant Carolina agreed to buy the assets of Plaintiff's company—Container Service Corporation ("CSC")—for $34 million. (Dkt. 157 ¶¶ 1–3, 7.)  An Asset Purchase Agreement governed the deal. (*Id.* ¶¶ 1–3.)  The Agreement required Defendant Carolina at closing to wire 95% of the purchase price to "an account designated in writing by [CSC]."  (Dkt. 150-6 § 2.05(a).)  The Agreement required Defendant Carolina to pay CSC the remaining 5% (the "Holdback Amount") about 18 months later.  (*Id.* §§ 2.05(b), 2.10(b).)[1]

In January 2017, the parties closed the deal and Defendant Carolina paid CSC 95% of the purchase price.  (Dkt. 157 ¶ 13.)   In December 2017, CSC assigned its right to receive the Holdback Amount to Plaintiff.  (*Id.* ¶ 22.)  Plaintiff's attorney (Defendant Ponder) sent a copy of the assignment to Defendant Carolina later that month.  (*Id.* ¶ 23.)  Defendant Carolina did not object to the assignment.  (*Id.* ¶ 26.)

On June 25, 2018, Defendant Ponder emailed Defendant Carolina's in-house attorney (Jim Cobery) about the Holdback Amount, which was

---

[1] The Court's description of the Agreement is an over-simplification.  But it is sufficient for the purposes of this Order.

due the following month.  (*Id.* ¶ 29.)  He explained the Holdback Amount was now "payable to [Plaintiff] per the Assignment," and offered to send another copy of the assignment if necessary.  (*Id.*)  He also attached wiring instructions for payment of the Holdback Amount to an account in Plaintiff's name at Bank of New York Mellon.  (*Id.* ¶¶ 29–30.) Mr. Cobery forwarded these instructions to Defendant Carolina's in-house team.  (*Id.* ¶¶ 31–32.)[2]

On June 30, 2018, another attorney for Defendant Carolina (Andrew Lehrer) responded to Defendant Ponder's email.  (*Id.* ¶ 34.)  He asked Defendant Ponder to confirm the Holdback Amount was $1.71 million.  (*Id.*)  Defendant Ponder replied that the Holdback Amount was $1.74 million, not $1.71 million.  (*Id.* ¶ 36.)  An hour later, Mr. Lehrer received an email from Defendant Ponder's email address instructing Defendant Carolina to wire the Holdback Amount to "an investment account" because Bank of New York Mellon was "under review:"

---

[2] Several people who worked on the deal for Defendant Carolina, including Mr. Cobery, were actually employed by Defendant Carolina's affiliates.  (*See* Dkt. 157 ¶¶ 5–6, 16–20.)  The Court refers to these individuals as Defendant Carolina's personnel because the exact identity of their affiliate employer is irrelevant to this Order.

| | |
|---|---|
| **From:** | william ponder <b_ponder@hotmail.com> on behalf of william ponder |
| **Sent:** | Monday, July 2, 2018 11:49 AM |
| **To:** | Lehrer, Andrew |
| **Cc:** | Jim Cobery |
| **Subject:** | Re: Payout of Escrow (Payment update) |

Hello Andrew,

just a quick update from Lloyd that Bank of New york Mellon is under review and can't be used to receive the payment, The payment should be wired to an investment account, Will forward bank details shortly. Sorry for any inconveniences.

Thanks,
Bill

(*Id.* ¶ 38.)   Mr. Lehrer then received another email from Defendant Ponder's email address with more information about the new payment instructions:

| | |
|---|---|
| **From:** | william ponder <b_ponder@hotmail.com> on behalf of william ponder |
| **Sent:** | Monday, July 2, 2018 12:47 PM |
| **To:** | Lehrer, Andrew |
| **Cc:** | Jim Cobery |
| **Subject:** | Fw: Payout of Escrow (Bank details) |
| **Attachments:** | Lloydpeebles (JAE Holdings).pdf |

Andrew,

See attached wiring instruction for $1,735,502.50, Please confirm once received and let me know when the wire will be done. Once again sorry for any inconveniences and thanks for your understanding. Will be looking forward to your email asap.

Thanks,
Bill

(*Id.* ¶ 41.)   The attached wiring instructions were for an account in the name of JAE Holding Limited at CTBC Bank Co., Ltd. in Hong Kong:

# JAE HOLDING LIMITED



## WIRE  INSTRUCTIONS

**Bank Name:**    CTBC Bank Co., Ltd. Hong Kong Branch

**Bank Address:**    28/f Two international Finance Centre,8 Finance Street, Central Hong Kong.

**Beneficiary:**  JAE Holding Limited

**Address:**    Flat 4,22/f Block B,New trade Plaza,6 on Ping Street, Shatin, N.T

**Usd Acct number:**  904-10-124607-6

**Swift Code:**  CTCBHKHH

(Dkts. 150-32 at 6; 157 ¶ 43.)

The next day, Mr. Lehrer sent Defendant Ponder an email explaining why he believed the Holdback Amount was $1.71 million. (Dkt. 157 ¶ 47.)  His email said nothing about the new wire instructions. (Dkts. 150-34 at 2; 157 ¶ 48.)  Mr. Ponder quickly responded that he agreed $1.71 million was the right amount and that Defendant Carolina should send the money to "the investment account (JAE Holdings):"

**From:**      william ponder <b_ponder@hotmail.com> on behalf of william ponder
**Sent:**      Tuesday, July 3, 2018 10:14 AM
**To:**        Lehrer, Andrew
**Cc:**         Jim Cobery
**Subject:**    Re: Payout of Escrow
**Attachments:**  Lloydpeebles (JAE Holdings).pdf

Andrew,

Yes just confirmed and you got the correct amount, Sorry for the confusion. I hope you got the new wiring instruction, they want the funds wired into the investment account (JAE Holdings). I have attached the bank details again to wire the amount of $1,710,000.
Please send payment confirmation once its done Asap so i can forward to them.

Thanks

Bill

(Dkt. 150-35 at 2.)  Mr. Lehrer forwarded this email—along with the new payment instructions—to Defendant Carolina's in-house team and asked them to complete the wire.  (Dkt. 157 ¶ 56.)  They did so a few hours later. (*Id.* ¶¶ 58, 76.)  The wire confirmation identified the "beneficiary" as JAE Holding Limited in Hong Kong.  (Dkts. 150-45 at 5; 157 ¶ 78.) No one at Defendant Carolina knew whether Plaintiff had any connection to JAE Holding Limited.  No one tried to find out before completing the wire.  And no one did anything more generally to confirm the accuracy or authenticity of the new wire instructions (beyond noting they were sent from Defendant Ponder's email account).  (*See* Dkt 157 ¶¶ 45, 53–55, 59, 64, 74, 129–131, 135, 138–140, 154–157, 163–164.)

6

The parties eventually discovered that Mr. Ponder's email account had been hacked, that it was the hacker (not Mr. Ponder) who sent the new wiring instructions to Defendant Carolina, that Plaintiff had no connection to JAE Holding Limited or the Hong Kong branch of CTBC Bank, and that the money sent to JAE Holding Limited had vanished. (*See* Dkts. 135 at 538; 136 at 119–120; 157 ¶¶ 39, 42, 51, 91–92.) Plaintiff never received the Holdback Amount. (Dkt. 157 ¶¶ 93, 196.)

Plaintiff filed this lawsuit in February 2019. His complaint asserts claims against Defendant Carolina for breach of contract (Counts 1–2) and breach of the implied covenant of good faith and fair dealing (Count 3). (Dkt. 46.) It also asserts claims against Defendant Ponder for negligence (Count 4) and legal malpractice (Count 5). (*Id.*) Plaintiff seeks damages of $1.71 million (the Holdback Amount) plus interest and attorneys' fees. (*Id.* at 27; Dkt. 150 ¶ 10.) All three parties have filed motions for summary judgment. Plaintiff and Defendant Carolina cross-move for summary judgment on Counts 1–3. (Dkts. 149; 150.) Defendant Ponder moves for summary judgment on Counts 4–5. (Dkt. 152.)

## II.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "it might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361.

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* The court must "resolve all reasonable doubts about the facts in favor

of the non-movant, and draw all justifiable inferences in his or her favor."
*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "It is
not the court's role to weigh conflicting evidence or to make credibility
determinations; the non-movant's evidence is to be accepted for purposes
of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739,
742 (11th Cir. 1996).

## III. Discussion

Count 2 claims Defendant Carolina failed to pay Plaintiff the
Holdback Amount in violation of the Agreement's indemnification clause.
(Dkt. 46 ¶¶ 77–89.) Plaintiff says he is entitled to summary judgment on
this claim because (1) the Agreement required Defendant Carolina to pay
the Holdback Amount to Plaintiff; and (2) Defendant Carolina paid the
Holdback Amount to JAE Holding Limited instead. (Dkts. 150-1 at 16–
18, 27–30; 169 at 6–9.) Defendant Carolina says *it* is entitled to summary
judgment because it "performed its obligation to wire the Holdback
Amount according to the written instructions it received from
Mr. Ponder's email account." (Dkt. 156 at 12; *see* Dkt. 149-1 at 11–14.)
The Court agrees with Plaintiff.

## A.    Indemnification Clause

The Agreement's indemnification clause says Defendant Carolina "shall pay and reimburse [Plaintiff] for . . . any and all Losses incurred or sustained by, or imposed upon, [Plaintiff] based upon, arising out of, with respect to or by reason of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [Defendant Carolina] pursuant to this Agreement."   (Dkt. 150-6 § 8.03(b).) Section 2.10 describes one of the "obligation[s] to be performed by [Defendant Carolina]" under the Agreement.   It says: "The Holdback Amount . . . shall be paid by [Defendant Carolina] to [CSC] on or promptly following the date that is eighteen (18) months after the Closing Date." (Dkt. 150-6 § 2.10(b).   Because CSC assigned its right to receive the Holdback Amount to Plaintiff, Section 2.10 functionally required Defendant Carolina to pay the Holdback Amount to *Plaintiff*.   That is so because "an assignee stands in the shoes of the assignor, with the right to exercise the rights and remedies possessed by or available to the assignor."   *In re Abeinsa Holding Inc.*, 2020 WL 6261632, at *3 (D. Del.

Oct. 23, 2020).[3]   No one disputes the validity of the assignment or "Carolina Container's [resulting] obligation to pay Mr. Peeples" under the Agreement.   (Dkt. 156 at 13; *see* Dkt. 169 at 6 ("The parties similarly agree that the [Agreement] and Assignment required Carolina Container to pay Peeples the Holdback Amount.").)[4]

---

[3] *See Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *44 (Del. Ch. Aug. 5, 1999) ("Where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights."); *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *10 n.70 (Del. Super. Ct. Apr. 2, 2003) (same).   The Agreement says it "and any related dispute shall be governed by and construed in accordance with the Internal Laws of the State of Delaware." (Dkt. 150-6 § 10.10(a).)   The parties agree Delaware law applies to Count 2.   (*See* Dkts. 149-1 at 7–8; 150-1 at 16.)

[4] The Agreement does say "[n]o Party may assign its rights . . . hereunder without the prior written consent of the other Parties." (Dkt. 150-6 § 10.07.)   And it is unclear whether Plaintiff's assignment complied with that provision.   But the Court deems the assignment effective because (1) Plaintiff sent the assignment to Defendant Carolina several months before the Holdback Amount was due; (2) Defendant Carolina had no "problem" with the assignment; (3) Defendant Carolina "did not dispute or contest the Assignment," even after Defendant Ponder explained the Holdback Amount was "payable to [Plaintiff] per the Assignment"; (4) no one argues the assignment was ineffective; and (5) Defendant Carolina appears to admit the assignment *was* effective.   (*See* Dkts. 134 at 130; 135 at 127; 136 at 67; 137 at 69; 157 ¶¶ 15 (Answer), 22–23, 26, 29, 94 (Answer).)   Even if the assignment were invalid, Plaintiff—as the sole shareholder of CSC—still suffered "Losses" as a result of Defendant Carolina's failure to pay the Holdback Amount to CSC.   (Dkt. 157 ¶ 21.) So he would still have a claim under the indemnification clause.

Defendant Carolina breached that obligation because it paid the Holdback Amount to JAE Holding Limited, not Plaintiff. Defendant Carolina may have *tried* to pay Plaintiff. It may have acted in good faith. It may have intended to fulfil its obligation under the Agreement. But, as a general rule, none of that matters. The Agreement says "[t]he Holdback Amount . . . shall be paid by Buyer to Seller." Defendant Carolina did not do that. So, "[u]nder elemental precepts of contract law," Defendant Carolina is "liable . . . for breach of contract even if [it] is without fault." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1089 (2020). "[A] party's good faith will not prevent his failure to perform a duty from amounting to a breach." *Scott v. Clarke*, 355 F. Supp. 3d 472, 505 (W.D. Va. 2019) (collecting authorities). That has been the rule "from time immemorial." *U.S. Fire Ins. Co. v. Cavanaugh*, 732 F.2d 832, 840 (11th Cir. 1984) (Hill, J. dissenting). "Contract liability is strict liability." *CITGO*, 140 S. Ct. at 1089; *see Jones v. Porter*, 438 F. Supp. 3d 101, 104 n.1 (D. Me. 2020) ("[C]ontract law generally operates on a strict liability system—i.e., if a party breaches, that party pays damages, regardless of the party's reason for breach."); *Bell v. Bd. of Educ. of Albuquerque Pub. Sch.*, 652 F. Supp. 2d 1211, 1219

(D.N.M. 2008) ("[C]ontract law is essentially a law of strict liability, with an accompanying system of remedies that operates without regard to fault.").

Plaintiff also suffered "Losses . . . based upon, arising out of, with respect to or by reason of" Defendant Carolina's breach because (1) he has not received $1.71 million that he would have received three years ago if the breach had not occurred; (2) he has not received any interest on that money in the interim; and (3) he has incurred "attorneys' fees" and "cost[s]" in order to "enforce[e] [his] right to indemnification." (Dkt. 150-6, Article I (definition of "Losses"); *see also* Dkt. 157 ¶ 194.)[5]

So, under the literal terms of the Agreement, the outcome is relatively straightforward here. "The Holdback Amount" was not "paid by Buyer to Seller" in violation of the Agreement. (Dkt. 150-6 § 2.10(b).) Plaintiff suffered "Losses" as a result. (*Id.* § 8.03(b).) Thus, Defendant Carolina "shall pay and reimburse" Plaintiff for those Losses pursuant to the indemnification clause. (*Id.* § 8.03); *see Arrow Truck Sales, Inc. v.*

---

[5] Under the Agreement, "'**Losses**' means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification." (Dkt. 150-6, Article I.)

*Top Quality Truck & Equip., Inc.*, 2015 WL 4936272, at *5 (M.D. Fla. Aug. 18, 2015) ("[buyer] breached contract for the Trucks because . . . [it] never provided payment for the Trucks to [the seller]"; instead, it sent payment to someone else based on fraudulent wire instructions from the seller's hacked email account).[6]

### B.   Defendant Carolina's Arguments

Defendant Carolina claims it "did exactly what it was required to do under the agreement." (Dkt. 149-1 at 2.)  It offers two arguments in support of that claim.  Both are essentially textual arguments.  (*See* Dkt. 149-1 at 2 ("express terms of the [Agreement]" are dispositive), 15 ("[T]here is no reason for the Court to look outside the four corners of the agreement.").)  Neither is persuasive.

---

[6] The indemnification clause requires Plaintiff to give Defendant Carolina "reasonably prompt written notice" of any claim. (Dkt. 150-6 § 8.05(c).)  But failure to comply with that requirement does not bar the claim "except and only to the extent that [Defendant Carolina] forfeits rights or defenses by reason of such failure." (*Id.*)  It is unclear whether Plaintiff complied with the notice requirement here but, even if he did not, there is no evidence—and no one argues—that this caused Defendant Carolina to forfeit any rights or defenses. *See Brace Indus. Contracting, Inc. v. Peterson Enters., Inc.*, 2016 WL 6426398, at *10 (Del. Ch. Oct. 31, 2016) ("Plaintiffs' indemnification claim is not barred procedurally" because, "[e]ven assuming that the Plaintiffs failed to give prompt written notice . . . , the Defendants here have not forfeited any rights or defenses by reason of that failure").

### 1.   Section 2.05

Defendant Carolina first claims it complied with the Agreement because Section 2.05 allowed it to wire the Holdback Amount to "an account designated in writing by Seller to Buyer," even if that account had no connection to the Seller.  (Dkt. 150-6 § 2.05(a); *see* Dkts. 149-1 at 12–13; 156 at 13; 157 ¶ 11 (Answer).)  But Section 2.05 does not govern payment of the Holdback Amount.  It governs payment of "[t]he Purchase Price Cash Amount *less the Holdback Amount*"—that is, payment of everything *but* the Holdback Amount.  (Dkt. 150-6 § 2.05(a) (emphasis added)).

Indeed, Section 2.05 is clear that "the 'Holdback Amount'[] shall be withheld by Buyer and shall be held and distributed in accordance with the terms of Section 2.10."  (*Id.*).  And Section 2.10 simply says "[t]he Holdback Amount . . . shall be paid by Buyer to Seller" 18 months after closing.  It says nothing about how that payment should be made.  It does not require a wire as opposed to some other payment method.  And it does not include the language from Section 2.05(a) requiring payment to "an account designated in writing by Seller to Buyer."  If the parties wanted these requirements to govern the Holdback Amount, they knew

how to say so.  *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to read an affirmative obligation into a contractual provision because, given the content of another provision, "the . . . drafters knew how to impose an affirmative obligation when they so intended"); *RCM LS II, LLC v. Lincoln Circle Assocs., LLC*, 2014 WL 3706618, at *8 (Del. Ch. July 28, 2014) ("The fact that the parties knew how to refer to [a concept] when they wanted to implies that" different language refers to a different concept).  Because they did not, the Court cannot rewrite the Agreement to do it for them.  *See Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969) ("[A] court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions.").

The upshot is that Defendant Carolina's first argument fails. Section 2.05 requires a specific payment method for the Purchase Price Cash Amount, whereas Section 2.10 leaves the payment method for the Holdback Amount to the discretion of the parties.  The only thing Section 2.10 requires is that Defendant Carolina pay Plaintiff the Holdback Amount.  Defendant Carolina violated that requirement because it paid JAE Holding Limited instead, albeit unknowingly.

16

## 2.   Section 10.02

Defendant Carolina next claims that, "[u]nder Section 10.02 of the [Agreement], [it] was entitled to rely on written communications received from Mr. Ponder's Hotmail account." (Dkt. 149-1 at 13.)  The Court again disagrees.

Section 10.02 is a notice provision.  It tells the parties where to address their communications with one another if they want those communications to count under the Agreement.  It says communications intended for Plaintiff must be sent to (1) Plaintiff's Alabama address or Gmail account and (2) Defendant Ponder's Georgia address or Hotmail account.  (Dkt. 150-6 § 10.02.)  Defendant Carolina points out that the Hotmail account listed for Defendant Ponder is the same email account from which the fraudulent wire instructions were sent.  It follows, says Defendant Carolina, that "it was contractually entitled to rely upon those instructions without further inquiry." (Dkt. 156 at 13.)

But Section 10.02 cannot bear the weight of Defendant Carolina's argument.   The provision simply identifies the addresses that "communications must be sent *to*"; it says nothing about the addresses those communications must be sent *from*. (Dkt. 150-6 § 10.02 (emphasis

added).)  In other words, Section 10.02 identifies the requisite address of the recipient, not the sender.  As a textual matter, Defendant Carolina cannot use a clause about the proper recipient to excuse its reliance on an improper sender.

Second, to the extent Section 10.02 does control whether the hacker's emails are operative under the Agreement, it suggests those emails were *in*valid rather than valid.   Section 10.02 requires communications intended for Defendant Carolina to be sent to Mr. Cobery *and* Ronald T. Sessions (Defendant Carolina's President).  (*Id.*; Dkt. 157 ¶ 90.)  There is no evidence the hacker sent his fraudulent wire instructions to Mr. Sessions.  So, under Section 10.02, those instructions are not "deemed to have been given."  (Dkt. 150-6 § 10.02.)

Finally, even if the hacker's emails did count as valid communications under Section 10.02, Defendant Carolina has not shown they override Defendant Carolina's explicit and material obligation under the Agreement to pay Plaintiff the Holdback Amount.   The Agreement is clear that Defendant Carolina must pay Plaintiff.  But the hacker's emails asked Defendant Carolina to pay someone else.  Faced with these conflicting instructions about a material obligation,

Defendant Carolina was required to follow the Agreement. That is so because the Agreement "may be amended, modified or supplemented only by an agreement in writing signed by each Party." (*Id.* § 10.09.) And any waiver of the Agreement's terms must be "explicitly set forth in writing and signed by the Party so waiving." (*Id.*) The hacker's emails complied with neither requirement.

Of course, "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021 WL 3575709, at *52 (Del. Ch. Aug. 13, 2021). So, too, can "provision[s] requiring written waiver." *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 110 n.26 (Del. Ch. 2006). But "oral waivers of written contracts are not favored." *Symbiont.io*, 2021 WL 3575709, at *52. And Defendant Carolina has not even argued—much less shown—a waiver occurred here. Quite the opposite. (*See* Dkt. 149-1 at 15 ("[T]here is no reason for the Court to look outside the four corners

of the agreement.").)  So, on the record here, the Court cannot say Section 10.02 cures Defendant Carolina's noncompliance with Section 2.10.[7]

### 3.   Other Arguments

The Court recognizes there is a "dearth of authority" on which party bears the loss "when wired funds have been fraudulently diverted by a hacker." *Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.*, 759 F. App'x 348, 359 (6th Cir. 2018); *Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F. Supp. 3d 915, 919 (D. Nev. 2020); *see Arrow*, 2015 WL 4936272, at *5 ("unable to find a factually similar case").  That leaves space for creative lawyering and a host of potential theories or conceptual frameworks for resolving Plaintiff's claims.  But the Court declines to "distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar*

---

[7] "[T]he standards for proving waiver under Delaware law are quite exacting." *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 1930428, at *6 (Del. Ch. June 19, 2007).  "A party claiming waiver must show that: (1) there is a requirement or condition to be waived; (2) the waiving party knows of the requirement or condition; and (3) the waiving party intended to waive that requirement or condition." *Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 740 (D. Del. 2016).  "Waiver must be proven with clear and convincing evidence." *Id.*  An "oral waiver must be of such specificity and directness that there is no doubt regarding the parties' intention to change the formally solemnized written contract." *Symbiont.io*, 2021 WL 3575709, at *52.

*Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  That is not the Court's job. "[C]ourts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."  *Makita U.S.A., Inc. v. Factory Direct Distributors LLC*, 2014 WL 12605510, at *1 (S.D. Fla. Aug. 6, 2014) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).  That means "the onus is upon the parties to formulate arguments."  *Resol. Tr. Corp.*, 43 F.3d at 599.  Defendant Carolina has made only two arguments here.  The Court has addressed them.  There may be others out there, some quite significant.  But the Court will not explore them uninvited.  Plaintiff has shown Defendant Carolina breached the Agreement.  And Defendant Carolina's limited arguments to the contrary are unavailing.  So the Court grants Plaintiff's motion for summary judgment on Count 2.

### C.   The Imposter Rule

The Court need not go further.  But a quick word about the "imposter rule" is in order because the parties briefed the issue extensively.  "Under the imposter rule, the party who was in the best position to prevent the forgery by exercising reasonable care suffers the loss."  *Arrow*, 2015 WL 4936272, at *5; *see Jetcrete*, 484 F. Supp. 3d at

919 (same); *see also Beau Townsend*, 759 F. App'x at 357 ("[L]osses attributable to fraud should be borne by the party in the best position to prevent the fraud."). No one insists this rule controls here. Defendant Carolina is adamant it does not. (*See* Dkts. 149-1 at 14–17; 156 at 13–17.) And Plaintiff says it offers "a helpful framework" but "is not necessary" to resolve his claims. (Dkt. 159 at 16; *see* Dkt. 169 at 9–10.) So the Court declines to apply the rule.

But even if the parties had asked the Court to apply the rule, the Court is not sure it would have done so. No Delaware court has ever invoked a freestanding imposter rule. And only a handful of other courts have done so.[8] Notably, those courts essentially created the rule by borrowing—and sometimes synthesizing—principles from elsewhere. *See, e.g.*, *Beau Townsend*, 759 F. App'x at 353–59 (combining Article 3 of the Uniform Commercial Code with the doctrine of mutual mistake while flirting with an agency theory); *Bile v. RREMC, LLC*, 2016 WL 4487864, at *10 (E.D. Va. Aug. 24, 2016) ("aggregat[ing]" the "common law contracts approach and the Article 3 approach" by "nesting Article 3

---

[8] In recent times, anyway. Plaintiff cites three cases from 1932–1954 that "employ[ed] a similar test." (Dkt. 150-1 at 19 n.4.) But none of those cases are from Delaware. And all of them are more than 60 years old.

principles within Restatement § 237"). That approach is in tension with the concept of judicial restraint. *See Marshall v. State Farm Fire & Cas. Co.*, 2013 WL 3003969, at \*3 (Del. Super. Ct. June 13, 2013) ("Principles of judicial restraint mandate that this Court refrain from promulgating entirely new law, whenever possible."). It is especially so here because the principles from which the imposter rule has been fashioned are inapplicable on their face.

Take Article 3 of the Uniform Commercial Code, for example. Courts applying the imposter rule almost always rely on this provision. But "Article 3 by its terms governs only negotiable instruments, not contract disputes or wire transfers." *Bile*, 2016 WL 4487864, at \*7; *see* U.C.C. § 3-102(a) ('This Article applies to negotiable instruments. It does not apply to money [or] to payment orders."). And a "hacked email transmitting a fraudulent [payment instruction] is not a negotiable instrument or even the transmittal of a negotiable instrument." *2 Hail, Inc. v. Beaver Builders, LLC*, 2017 Colo. Dist. LEXIS 1294, \*4 (Colo. D. Ct., Nov. 29, 2017). So Article 3 simply does not apply here. The Court cannot "combine the common law of contracts with the statutory law governing negotiable instruments" without straying into the realm of

judicial law-making.  *Id.*  And, that sort of venture is inappropriate, particularly in a diversity case.  *See Booker v. Peterson Cos.*, 412 F. App'x 615, 617 (4th Cir. 2011) ("The function of federal courts sitting in diversity . . . is to ascertain and apply the law of a State as it exists and not to create or expand that State's public policy.").[9]

The doctrine of mutual mistake is another example.  At least one court has relied on that doctrine as codified in the Restatement of Contracts.  *See Beau Townsend*, 759 F. App'x at 353–55.  But mutual mistake applies only if both parties make a mistake "*at the time a contract was made* as to a basic assumption on which the contract was made."  Restatement (Second) of Contracts § 152(1) (1981) (emphasis added).  Where, as here, the parties develop a mistaken impression about something *after* they sign the contract, the Restatement's rule seems inapplicable on its face.  *See Duncan v. STTCPL, LLC*, 2020 WL 829374, at *8 (Del. Super. Ct. Feb. 19, 2020) ("The mutual mistake must exist at the time of contract formation.").

---

[9] Notably, "[w]ire transfers are explicitly governed by Article 4 of the U.C.C., not Article 3's rules for negotiable instruments."  *Bile*, 2016 WL 4487864, at *7 n.17.  It would be odd to borrow a provision that explicitly does *not* apply where that provision is part of a larger code containing other provisions that *do* apply.

Another reason to hesitate before applying the imposter rule here is the sophistication of the parties and the Agreement.  The Agreement is more than 60 pages in length.  It is a detailed, fully integrated document.  It was negotiated by capable parties with the aid of counsel. And it says nothing whatsoever about the imposter rule (or anything like it).  Instead, it says unambiguously that "[t]he Holdback Amount . . . shall be paid by Buyer to Seller."  There are no caveats or qualifications. Defendant Carolina was "of course free to contract for such limitations." *CITGO*, 140 S. Ct. at 1089–90.  After all, any "obligor who wishes to avoid strict liability for [a] breach may limit his obligation by agreement." *Id.* at 1089–90.   But Defendant Carolina did not do that here.   And "[s]ophisticated parties are bound by the unambiguous language of the contracts they sign." *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *1 (Del. Ch. July 9, 2002).

Moreover, even if the imposter rule did apply, it would not change the outcome here.  Defendant Carolina was "the party in the best position to prevent the fraud." *Beau Townsend*, 759 F. App'x at 357.   No reasonable jury could conclude otherwise based on the undisputed evidence in the record.   Under one version of the imposter rule, that

25

means Defendant Carolina bears 100% of the loss resulting from the fraud—even if Defendant Ponder could also have done more to prevent it. *See Jetcrete*, 484 F. Supp. 3d at 920 (requiring buyer to bear 100% of the loss because it "was in the best position to prevent the loss by taking the reasonable precaution of verifying the wiring instructions by phone"—"[e]ven if [seller] failed to use reasonable care" to prevent the fraudulent wiring instructions from being sent).

Under another version of the rule, Defendant Carolina would still be liable for breach of contract under Count 2 and summary judgment would still be appropriate here. The only difference is that Defendant Carolina might be on the hook for less money because a factfinder must "apportion the loss according to [the parties'] comparative fault." *Beau Townsend*, 759 F. App'x at 357. But, even under this approach, Defendant Carolina would still shoulder the vast majority of the loss because it undoubtedly shoulders the vast majority of the blame for that loss. It may even shoulder *all* the blame, which would make it liable for the full amount notwithstanding any apportionment. *See, e.g.*, *Arrow*, 2015 WL 4936272, at *6 ("[Buyer] should have exercised reasonable care after receiving conflicting e-mails containing conflicting wire instructions

by calling [seller] to confirm or verify the correct wire instructions prior to sending the $570,000.   As such, [buyer] should suffer the loss associated with the fraud."); *Parmer v. United Bank, Inc.*, 2020 WL 7232025, at *6 (W. Va. Dec. 7, 2020) ("[H]ad Ms. Parmer or her counsel exercised reasonable care and verified the wire transfer instructions her counsel received, the loss could have been averted. . . .  Ms. Parmer must bear this loss.").

### D.   Conclusion

Defendant Carolina agreed to pay Plaintiff the Holdback Amount. It did not do that.  Plaintiff suffered Losses as a result.  Those Losses include $1.71 million, interest, and reasonable attorneys' fees.   The Agreement's indemnification clause requires Defendant Carolina to "pay and reimburse" Plaintiff for those Losses.  Defendant Carolina has not shown it should be excused from that requirement.  So the Court grants Plaintiff's motion for summary judgment on Count 2.  The Court denies as moot the parties' motions for summary judgment on the other counts (Counts 1 and 3–5) because, as Plaintiff acknowledges, those claims present alternative theories of recovering the same damages.  (*See* Dkts. 150-1 at 30 n.8 ("If summary judgment is granted as to Count 1

and/or Count 2, Count 3 is moot."); 159 at 7–8 ("the result is the same" under Counts 1 and 2 so it does not matter which count is successful); 184 at 1 ("[T]he Court would not be required to adjudicate Plaintiff's claims against Defendant Ponder if it grants Plaintiff's motion for summary judgment against Defendant Carolina.").)

The parties have not submitted evidence or argument about the amount of interest and attorneys' fees to which Plaintiff is entitled. So the Court cannot determine Plaintiff's final monetary award on the current record. The Court orders Plaintiff and Defendant Carolina to meet and confer in a good faith effort to resolve the total amount to which Plaintiff is entitled from Defendant Carolina under Count 2 (or, at the very worst, to narrow the issues in dispute). At least some of the parties' discussions should be in person. If the parties are unable to reach a resolution, Plaintiff shall file, no later than November 1, 2021, evidence and argument about the total amount of Losses he is entitled to recover from Defendant Carolina under Count 2. Defendant Carolina shall file its response no later than November 15, 2021. Plaintiff shall file a reply no later than December 6, 2021. The parties should indicate whether

they believe a hearing is required as a matter of law and, if it is not, whether they want a hearing anyway.

## IV.   Conclusion

Plaintiff's Motion for Partial Summary Judgment (Dkt. 150) is **GRANTED** as to Count 2.  It is otherwise **DENIED AS MOOT**. Defendant Carolina's Motion for Summary Judgment (Dkt. 149) is **DENIED** as to Count 2.  It is otherwise **DENIED AS MOOT**.  Defendant Ponder's Motion for Summary Judgment (Dkt. 152) is **DENIED AS MOOT**.   Defendant Ponder's Motion to Amend (Dkt. 176) is also **DENIED AS MOOT**.

**SO ORDERED** this 16th day of September, 2021.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE